IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SEP 22 '00 9:09

U.S. DISTRICT COURT
N.D. OF ALABAMA

BERNICE MARLOW,                )
                               )
          Plaintiff,           )
                               )
v.                             )        Case No. CV-99-TMP-0902-S
                               )
BUFFALO ELECTRIC CO., INC.,    )
                               )
          Defendant.           )

ENTERED

SEP 2 2 2000

## MEMORANDUM OPINION

This cause is before the court on the motion for summary
judgment filed by the defendant, Buffalo Electric Company, Inc.,
("Buffalo") on February 29, 2000.  Defendant seeks dismissal of all
of plaintiff's claims because, defendant contends, there is no
genuine issue as to any material fact and defendant is entitled to
judgment as a matter of law.  This matter has been fully briefed
and the court has considered the evidence and the arguments set
forth by both parties.  The parties have consented to the exercise
of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c).

## I.  FACTS

Plaintiff Bernice Marlow brought this action pursuant to the
Age Discrimination in Employment Act, 29 U.S.C. §§ 216 and 626,
("ADEA"), the Americans with Disabilities Act, 42 U.S.C.
§ 12117(a), ("ADA"), Title VII of the Civil Rights Act of 1964, 42



U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981A.  In addition, Marlow asserts state law claims of breach of contract, breach of an implied covenant of good faith and fair dealing, fraud, intentional infliction of emotional distress, and wrongful discharge.  Marlow alleges that she was terminated from her employment as credit manager at Buffalo because of her age, medical problems, gender, and because she did not accede to sexual advances from males in the workplace.

Plaintiff's discrimination claims arise from her employment as the credit manager at Buffalo, a small electrical wholesale business in Birmingham, Alabama.  Viewed in the light most favorable to the plaintiff, the following facts[1] are relevant to defendant's motion:

Marlow, a female, was hired by Buffalo in 1988, when she was 44 years old.  She continued to work there for approximately eight

_____

[1]    The court notes that the plaintiff has submitted the depositions of Buffalo's owner, Tom McCarroll, and employees or former employees Teresa Jackson (volumes I and II), Steve Schneider, and Kirk Cowart (volumes I and II).  In addition, the plaintiff has submitted an affidavit of Linda Thomas and an affidavit of the plaintiff, to which is attached an unverified "statement" of Dana Armstrong.  The defendant has submitted portions of several depositions and affidavits of Buffalo employees or former employees, and portions of the deposition of Bernice Marlow.  Plaintiff, in her sur-reply filed by permission of the court after the deadlines for briefing of the summary judgment motion, makes numerous citations to her deposition, but has failed to attach the relevant portions to the sur-reply. Those pages to date have not been provided to this court. Consequently, such alleged facts not supported by any evidence are not considered by the court in reaching its conclusions.

years.  Although the categorizations of the positions she held over the years is not entirely clear, Marlow spent all of her tenure at Buffalo working in the credit office.  Her duties included depositing monies received, balancing the accounts receivable, filing invoices, handling payroll, and other financial duties.  She considered herself to be the office manager early in her tenure, but was never given any title.  Later she was told that her title was credit manager, and she remained in that position until she left Buffalo.  During her tenure, the accounting office and the credit office were separated, and Teresa Jackson, also a female over age 40, became the accounting manager with responsibility over some of the accounting workers.  Marlow remained as credit manager, with duties "separate but equal to" Jackson.  Marlow was supervised for some years by David Young, an operations manager.  She ultimately, as well as sometimes directly, reported to the company's owner, Tom McCarroll.  During her eight years at Buffalo, Marlow received one written reprimand.  In December of 1994 she was "written up" for failing to properly process credit applications and for failing to keep customer records up-to-date.

Marlow was 53 when she was terminated.  She was replaced by Teresa Jackson, who was 51 years old when Marlow was terminated.  At Buffalo, all of the employees who worked in the accounting and credit offices at the relevant time were women.  All of the male employees either worked in the warehouse, in sales, or in

3

management.   All of the women employees were paid on an hourly basis, until Jackson was placed on a salary about two years after Marlow was terminated.   Marlow was hired at a pay rate of approximately five dollars per hour, and received several raises over the years.   When she left, she was one of the highest-paid hourly employees at Buffalo, earning more than twelve dollars per hour.

Shortly after Marlow began working at Buffalo, Jackson, who was a friend of Marlow's from a previous workplace, was hired to work in the accounting department.   Jackson reported directly to Lori Fisher.   Shortly after Jackson began working at Buffalo, Fisher told Jackson that she had engaged in sexual relations with McCarroll.   Jackson repeated to Marlow what Fisher had said. McCarroll admits that during the years Marlow worked at Buffalo he had sexual relationships with Fisher and with two other Buffalo employees.

McCarroll also admits that he sometimes rubbed the shoulders of female employees.   In some instances, he admits that the rubbing of the shoulders led to fondling of the breasts and to other sexual encounters.   Marlow has testified that McCarroll rubbed her shoulders at least 20 times, and that on one occasion he pressed her against a wall and rubbed her shoulders so forcefully that she

was in pain and cried out for help.[2]   Marlow does not accuse
McCarroll of touching her breasts.  Marlow also complains that Leon
Hawkins, a salesman, often poked her in the buttocks with a pen and
reached toward or gestured toward her breasts.  Hawkins worked in
the front office, an area separate from the credit office, but
Marlow occasionally had to go to the front counter to retrieve
materials.  It is not clear how often Hawkins poked her or gestured
toward her, but Marlow claims it was not infrequent.   In response
to Hawkins' behavior, Marlow consistently told him to stop and
continued with her work.   Hawkins was terminated in 1999 for
reasons unrelated to any allegation of harassment.  Marlow admits
she never reported Hawkins' behavior to any supervisor.[3]

Playboy  magazines  and  other  similar  publications  were
repeatedly found in the men's restroom.[4]  McCarroll  testified that

_____

[2]     Marlow testified that two other women working in the
department complained to her about having their shoulders rubbed
by McCarroll.  However, even though Marlow considered herself the
supervisor of the two women who complained, she apparently never
passed on their complaints or took any action to ask McCarroll to
stop.

[3]     Later in her deposition, Marlow states that she
probably did complain about Hawkins, but does not remember when
or to whom she complained.  Such vague assertions are
insufficient to create a genuine issue of material fact.

[4]     Although Marlow complains about the presence of the
magazines, it is clear that the magazines were present only in
the men's restrooms, and the women had a separate restroom at the
time Marlow worked for Buffalo.  There is no testimony that the
magazines were displayed anywhere other than in the men's
restroom, nor is there any explanation for why the female

when he found such materials in the restroom he would throw them away. Some male employees posted "pin-up" calendars in the workplace. Marlow, in response, posted a poster of Patrick Swayze wearing overalls and a poster of a male model in a bathing suit in her office. She and other female employees also put a poster of Disney's "Little Mermaid" in the workplace as a "joke" in response to the men's pictures of scantily clad women. Marlow testified that she complained to David Young that the posters of women in bikinis should be removed from the workplace, and admits that they were removed after she complained. She states, however, that similar posters later reappeared. There is no indication that Marlow lodged any subsequent complaints.

Several female employees[5] cut out pictures from the pornographic magazines and attached them to the men's time-cards. McCarroll eventually required all of the posters and pin-up calendars to be removed, although Marlow testified that the male employees' magazines reappeared in the workplace in spite of McCarroll's actions.

Part of the duties of the office workers involved emptying cash boxes kept at the front counter. At one point, a female

---

employees saw the magazines if they were in the men's restroom.

[5]    There has been testimony that Marlow participated in placing the pictures on the time-cards, but she denies having done so.

6

employee placed a baby-doll nightgown in the cash box, and a male employee apparently responded by placing a condom that was filled with lotion in the cash box.[6]

Jackson has testified that sexual horseplay was common in the office, and that it was done in a joking manner.  She also testified that she overheard  Marlow make a remark to a co-worker that he should clear off his desk because she was coming back there, implying in a joking manner that Marlow was going to have sex with him.  Jackson also stated that she, Marlow, and at least one other employee had made pictures of their breasts on the office photocopying machine.[7]  Marlow once told a male employee a sexually suggestive joke about being able to make his "teeth sweat."  Marlow admits that not all of the sexually suggestive conduct was initiated by the males.  She describes the atmosphere at Buffalo as "male/female constantly back and forth."

During the last year that Marlow worked at Buffalo, McCarroll was in the midst of a divorce.  During that time, McCarroll used the word "fucking" in conversation with Marlow on one occasion, and once asked Marlow if she wore garlic in her bra.  McCarroll talked

---

[6]     There has been testimony that Marlow placed the nightgown in the cash box, but Marlow denies taking part in any of the cash box incidents.

[7]    Linda Thomas, a former Buffalo employee who brought sexual harassment claims against the company, said that she saw a female employee photocopy her breast.

with Marlow at length about his divorce and expressed anger and hostility toward his wife.

McCarroll at one point instructed all employees to stop engaging in sexual touching and banter.  He banned the suggestive calendars and posters from the office.  He also held a meeting with male employees and told them to stop bringing the sex-oriented magazines into the office.

Marlow asserts that males at Buffalo were treated differently than females.  She claims that males were placed on salary instead of paid by the hour, and were given extra benefits.  Specifically, Marlow claims that only the men were allowed to park in the company parking lot and that the men were given gas keys which allowed them to pump gas at company pumps and have the gas charges deducted from their paychecks.  Marlow admits, however, that when the women complained about the parking problem, the men were told to move their cars.[8]

At all times relevant to this lawsuit Buffalo had a policy prohibiting sexual harassment in the workplace.  The policy was contained within the employee handbook, and Marlow acknowledges that she received a copy and kept it in her desk for reference. The policy states:

---

[8]     Male employees have testified that the women were given the parking spots closest to the building for safety reasons.

8

> The company absolutely prohibits any form of harassment, whether racial, sexual, ethnic, or other harassment, by and of any of its employees. The term "sexual harassment" for purposes of this policy shall mean "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature."
>
> Any employee who violates this policy is subject to disciplinary action up to and including discharge. The Company maintains an "open-door" policy respecting complaints of this nature. If an employee has a complaint, he/she should contact his/her immediate supervisor and the President. Of course, complaints about an employee's immediate supervisor should be made to that supervisor's supervisor, or to the Company President.

There is no evidence that Marlow ever lodged any complaint with any supervisor about the harassment or sexual discrimination of which she now complains.[9] Marlow contends that she discussed these issues with other female employees, including Jackson, but does not argue that Jackson was her supervisor. Marlow also admits that she never made any specific complaints to McCarroll or any supervisor concerning either McCarroll's shoulder-rubbing or Hawkins' prodding. She does claim that other women complained about sexual harassment and were retaliated against. The only

---

[9]     Marlow's attorney asserts in Plaintiff's Reply Brief at page 6 that Marlow reported the harassment to Young, who advised her not to be alone with McCarroll, and not to "cause any problems." The testimony to which counsel refers, however, has never been submitted to this court and is not part of the record; consequently, the court does not consider this alleged fact in reaching its conclusions.

9

specific instance she relates is that Dana Armstrong, a female employee, complained about "a remark" made by a male employee and was later told that she should not wear overalls, or a dress with cutouts at the neckline, to the office.   There is no evidence, however, that the dress rules were related in any way to her alleged complaint.[10]

Marlow testified generally that other female employees complained to *her* about harassment.   It is not clear whether Marlow passed those complaints along to higher management; she admits, however, that the women who complained were not terminated as a result of the complaints.

In October of 1996, Jackson was absent from the workplace for some time because of her husband's surgery, and Marlow performed some of Jackson's duties.   Marlow asserts that October was a difficult month because of Jackson's absence and because of computer problems.   In addition, Marlow asserts that at the time of her termination she was suffering from hyperparathyroidism.   She was not diagnosed with that ailment until after her termination; however, she told Jackson prior to the termination that her calcium

---

[10]   In an affidavit submitted by the defendant, Armstrong explains that the office had a "business dress" policy at the time and that her overalls and cut-out dress were too casual to fit within the policy.   She also testifies that she never complained of sexual harassment.   Consequently, the court finds there is no allegation of retaliation that is supported by any evidence.

level was elevated, that the doctor was "concerned," and that she would have to undergo surgery if a tumor was present.  There is no evidence that Marlow told McCarroll about her suspected condition or that Jackson told McCarroll about the plaintiff's suspected ailment.  To the contrary, Jackson denies that she knew anything more than that Marlow told her that her calcium level was high.

Also during October of 1996, Marlow asserts that interviews were being conducted for a position in the accounting office and that, after one applicant left, McCarroll asked if they were interviewing "that older lady."  Marlow also commented that some of the women working in accounting were not performing their jobs properly, and was told by Jackson that she was "so old" that she had forgotten what it was like to work with young people.

It is undisputed that by the end of October of 1996, Marlow had failed to post payments to customers' accounts for a full month.  As a result, Buffalo was unable to send monthly statements to its customers at the prescribed time in early November.  Such a delay would, in turn, delay Buffalo's receipt of payments by the customers.  In early November, McCarroll learned that Marlow had failed to record the payments.  He discussed this issue with Jackson, after which McCarroll decided to terminate Marlow.[11]  On

---

[11]    The testimony regarding the decision to terminate Marlow is somewhat confusing.  McCarroll testified that he discussed with Jackson the problem concerning Marlow's failure to do her job during October.  Jackson denied having known that

November 7, 1996, Mitchell Bailey, with two other Buffalo employees acting as "witnesses," told Marlow simply that her services were no longer needed.  On that day, Marlow collected her personal items and was escorted out of the building.  Subsequently, Marlow filed an EEOC charge asserting age and sex discrimination.  She amended her charge to add a claim of discrimination on account of a disability.  In April of 1999, Marlow filed the complaint that commenced this action.

## II.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

_____

McCarroll was going to fire Marlow until after the action was taken.  The actual termination was conducted by Mitchell Bailey. Taking all of the testimony together, however, it is clear that McCarroll discussed the work that needed to be done with Jackson, then made the decision to terminate Marlow on his own, and then instructed Bailey to inform Marlow of her termination.

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. <u>Celotex</u>, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." <u>Id</u>. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Id</u>. at 324 (quoting Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. <u>Celotex</u>, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Id</u>. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   Id. at 249.  His guide is the same standard necessary to direct a verdict: "whether the  evidence  presents  a  sufficient  disagreement  to  require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there  is  some  metaphysical  doubt  as  to  the  material  facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly  probative,  summary  judgment  may  be  granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court

14

must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

### A. Age Discrimination

Plaintiff asserts a claim arising from the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., ("ADEA"). The ADEA prohibits an employer from using the employee's age as a "determining factor" in any decision to terminate the employee. Zaben v. Air Products & Chemicals, Inc., 129 F.3d 1453 (11th Cir. 1997). In order to survive a motion for summary judgment, the plaintiff in an age-discrimination case first must establish a prima facie case. In order to establish the prima facie case of

15

discrimination, a plaintiff may present to the court: (1) direct evidence that "discriminatory animus played a significant or substantial role in the employment decision," Eskra v. Provident Life and Accident Insurance Company, 125 F.3d 1406, 1411 (11th Cir. 1997), or (2) circumstantial evidence of discrimination, in accordance with the four-part test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed. 2d 668 (1973), or (3) statistical evidence of a pattern of discrimination. Zaben, 129 F.3d at 1457.

Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without requiring the factfinder to make any inferences or presumptions. Carter v. City of Miami, 870 F.2d 578, 580-81 (11th Cir. 1989). When the plaintiff relies upon circumstantial evidence, rather than direct evidence, she creates a presumption of discrimination by establishing a *prima facie* case. The presumption may be rebutted, however, if the employer offers a legitimate, nondiscriminatory reason for the employment action. Once the nondiscriminatory reason is articulated, the burden shifts to the plaintiff to show that the reason is either not worthy of belief or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the proferred reason. Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998) reh'g and reh'g en

*banc* denied, 172 F.2d 884 (11th Cir. 1999), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

In this case, Marlow attempts to show direct evidence of discrimination.  The plaintiff asserts that her supervisor, McCarroll, made a discriminatory remark about interviewing an "older lady," which, she claims, creates an inference that McCarroll preferred young employees.  Marlow also complains that Jackson, a co-worker, called Marlow "old," indicating an animus based on age.  Marlow does not offer any statistical evaluation of Buffalo's hiring or firing practices.  Essentially, the court must determine whether the plaintiff has presented competent admissible evidence that Buffalo dismissed Marlow because of her age.  United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983).

It is not the duty of this court to evaluate whether the decision to fire her was fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes such as the ADEA.  See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991). Questionable business judgment is not evidence of discrimination. Id.

As evidence of discrimination, plaintiff's counsel offers the following testimony from plaintiff's deposition:

Q. Still under Roman numeral three, you say also I believe that I was discriminated against because of my age. Tell me why you feel that way.

A. When Angie Clevenger left we were doing some interviewing, and there was a lady that left after an interview, and as she walked out the door, Tom [McCarroll] saw her leave and he came back and he said are y'all interviewing that older lady? She had like salt and pepper hair. And Kathy just laughed because she was, I think – I don't remember her exact age. I know that we didn't ask her how old she was, but she just didn't appear to be an older woman to us. And Kathy just thought that was funny that he would say that, that she laughed.

And another point in time, I had talked to Teresa about the girls that were helping in accounting. And we were – I was discussing with her the fact that after she left each day they were not working, they were just goofing off. And she said you have just forgotten how it is – you are so old you have forgotten how it is to work with young people.

Q. Who said that to you?

A. Teresa.

Q. Now, Teresa was never your supervisor, was she?

A. No.

Deposition of Marlow, pp. 90-91.

The court first notes that Marlow attempts to connect the comment by Jackson to her termination by alleging that Jackson was the person who recommended that Marlow be terminated. However,

18

aside from Marlow's bare assertion, there is no evidence to support this position.    The Eleventh Circuit Court of Appeals has determined that "a statement by a person who played no part in the adverse personnel decision is not direct evidence of discrimination." Eskra, 125 F.3d at 1411.  Jackson claims she was unaware that McCarroll had decided to terminate Marlow until after the firing, and McCarroll's testimony that he talked to Jackson before the termination indicates no more than that he discussed Marlow's failure to post the payments with Jackson and sought her assistance in getting the end-of-month posting and billing completed within a short time.  The evidence is uncontroverted that McCarroll made the decision to fire Marlow; therefore, Jackson's comment is not the statement of a decision-maker and is not evidence of discrimination.

Assuming Jackson made the comment about Marlow's age that the plaintiff now complains of, that simple statement does not support a conclusion that Buffalo engaged in age discrimination.  Even if Jackson were a decision-maker whose statement was attributable to Buffalo, the court finds that a single, off-hand comment, made between friends of about the same age who had worked together for many years, is simply insufficient to create a genuine issue of material fact.

As for the comment by McCarroll, because he was plaintiff's supervisor and the decision-maker, the court must determine whether

19

a reasonable factfinder could determine that the comment indicates that Marlow's age was a determining factor in McCarroll's decision to fire her.  First, the court notes that the comment is the only age-related comment that plaintiff reports McCarroll made during the more than eight years she worked there.  Second, the comment is ambiguous and could as easily be construed as a method of identifying an applicant whose name was unknown to McCarroll, just as one might describe someone as short, or thin, or red-haired. There is no evidence that supports Marlow's contention that the remark indicated age-based animus, or that McCarroll did not wish to hire "older" employees.  Accordingly, that statement is "untainted by unlawful age bias," and cannot constitute direct evidence of age discrimination under the analysis set forth in Dilla v. West, 4 F. Supp. 2d 1130, 1140 (M.D. Ala. 1998).  Third, and perhaps most telling, is the fact that McCarroll hired the plaintiff when she was in her forties, that he also hired Jackson when she was in her forties, and that he replaced the plaintiff with Jackson, a woman in her fifties who was only a couple of years younger than Marlow.  Finally, McCarroll's remarks require an inference that, because McCarroll referred to one applicant as an "older lady," McCarroll wished to deny employment to older workers. Because an inference is required, the evidence falls short of the direct evidence standard.  Moreover, the court must consider that

20

McCarroll has articulated a nondiscriminatory reason that Marlow was terminated: her failure to do her job properly during October.

Because Buffalo has offered a nondiscriminatory reason for the termination, Marlow must, in order to overcome the defendant's motion for summary judgment, demonstrate by competent, admissible evidence that Buffalo's nondiscriminatory reason is merely a pretext and that Buffalo's true reason is age-based discrimination. The reason given by the employer "cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993). The plaintiff has not shown that Buffalo's proferred reason is a sham. This court's role is not to evaluate the wisdom or fairness of such a conclusion, but merely to determine whether that conclusion was the real reason behind McCarroll's decision to fire Marlow or a pretext for age discrimination. Furthermore, the court should determine whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contra-dictions" in the employer's articulated reason for the termination that it is "unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)(citations omitted).

The court finds little or no support for plaintiff's argument that the reason given is a pretext. Although there is ample evidence that McCarroll had a habit of engaging in sexual

21

relationships with some female employees, there is no evidence that McCarroll had a motive to fire the older employees. While there may be merit to Marlow's argument that she was treated harshly for one month's mistake, Buffalo nevertheless has the right to determine the proper remedy for such failure so long as the remedial action is not unlawfully applied to employees in a protected group.[12] For all these reasons, the court finds that Buffalo's articulated reason has not been demonstrated to be unworthy of belief, and age animus is not more likely the reason behind Marlow's termination. Consequently, defendant's motion for summary judgment on plaintiff's age-discrimination claim is due to be granted.

### B.  Discrimination on Account of a Disability

Plaintiff asserts a claim arising from the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). The ADA prohibits any "covered entity" from discriminating "against a qualified individual with a disability because of the disability of such individual...." 42 U.S.C. § 12112(a). In order to support a

---

[12]    The plaintiff makes the bald assertion that other employees who failed to perform their jobs adequately were not fired; however, there is no evidence that any other employee failed to perform an essential duty for a month or that any other employee's nonfeasance created a financial or workforce problem as severe as that caused by Marlow's failure to timely credit the customers' accounts.

claim that Buffalo violated this section, three criteria must be met. Marlow must show that: (1) she has a disability; (2) she is "qualified" for the job; and (3) her termination constitutes unlawful discrimination that is based on the disability. See Swain v. Hillsborough Cty. School Bd., 146 F. 3d 855, 857 (11th Cir. 1998); Tyndall v. National Educ. Ctrs., 31 F.3d 209, 212 (4th Cir. 1994). The issue before this court is whether Buffalo violated the ADA by firing Marlow, who asserts that she was suffering from an illness known as hyperparathyroidism at the time of her termination.

Under the ADA, a person may be disabled if he or she meets one of the three definitions of disability: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Under the first definition of a disability, "major life activities" have been deemed to include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). For an impairment to "substantially limit" a major life activity, the disabled person must be unable to perform, or must be significantly limited in the ability to perform, an activity, as compared to an average person. See Terrell v. USAIR, 132 F.3d 621, 625 n.4 (11th Cir. 1998); McKay v. Toyota Mtr. Mfg., 878 F. Supp. 1012, 1014

23

(E.D. Ky. 1995) <u>aff'd</u>, 110 F.3d 369 (6th Cir. 1997).  In order to meet the second definition of disabled, the plaintiff must show that she "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." <u>McKay</u>, 878 F. Supp. at 1014-15.  The third definition of disability also protects individuals who are "regarded" as disabled.  This protection is triggered only where the plaintiff demonstrates that the employer "treated [her]... as having a substantially limiting impairment."  29 C.F.R. § 1630.s(1).

This court first notes that the plaintiff does not offer any evidence, aside from her own testimony, that she has been diagnosed with any disease or impairment, much less that any disease or impairment causes her to be unable to perform any "major life function."  Marlow has not described a single way in which her illness has substantially limited any major life activity.  To the contrary, Marlow asserts that she was working long hours and performing many tasks at Buffalo the month before she was fired.  Logically, if Marlow was able to work as hard as she claims she was, she must also have been able to care for herself, walk, see, hear, speak, breathe, and learn.

Marlow simply asserts that she was suffering from the ailment she describes and argues that, because hyperparathyroidism is listed in a medical book of disabilities, she is within the group

24

of those protected by the ADA.  Without, at the very least, corroborating evidence concerning the nature and severity of this illness, Marlow's bald assertion is insufficient to support her claim that she is disabled.

Just as Marlow has failed to show that she had such an impairment, she has likewise failed to show a "record" of such impairment or that she was "regarded" as having such an impairment. To the contrary, those who worked with her closely were unaware that she was suffering from any serious ailment.  Jackson has testified that she knew nothing more than that Marlow had talked about her calcium and had said that, *if* the doctors found that she had a tumor, she would have to undergo surgery.  McCarroll did not know anything about her ailment until after she left Buffalo's employment.  And the plaintiff has not offered any additional evidence that any management employee – or any lower-level employee for that matter – knew of Marlow's alleged disability.[13]  Even Marlow admits that her hyperparathyroidism was diagnosed only *after* she was terminated.  Without evidence that the employer had actual or constructive knowledge of the disability at the time it discharged her, Marlow's claim must fail.  Morisky v. Broward

---

[13]    The plaintiff offers vague assertions that co-workers said she was "paranoid" as evidence that she was regarded as disabled.  Such vague and abiguous statements, however, fall far short of constituting evidence of a disability that is covered by the ADA.

County, 80 F.3d 445, 448 (11th Cir. 1996).  It is beyond the realm

of reason for the court to assume that, even though Marlow and her

doctor were unaware of this "disability," her employer somehow

deduced it and "regarded" Marlow as disabled.

In this case, the facts simply do not show the existence of a

disability cognizable under the ADA.  Furthermore, the plaintiff

has testified that she is no longer being treated for this ailment,

which indicates that the ailment was a temporary and treatable

condition.   Accordingly,  the  plaintiff's  condition  is  not

cognizable as a disability under the ADA.  See Standard v. A.B.E.L.

Services, Inc., 161 F.3d 1318, 1328 (11th Cir. 1998)(recognizing

that the severity, duration, permanence, or expected long-term

impact of an impairment must be considered in assessing whether the

impairment constitutes a disability under the ADA).  The evidence

is  clear  that,  even  though  Marlow  may  have  suffered  from

hyperparathyroidism at or about the time she was terminated, she

has not met her burden of demonstrating that she is disabled under

the ADA.  As a result, defendant's motion for summary judgment is

due to be granted.[14]

_____

[14]     Even if plaintiff had shown that she has a "disability"
within the meaning of the ADA and that she is "qualified" to
perform her duties with reasonable accommodation, summary
judgment would be due to be granted for the defendant for the
additional reason that plaintiff has failed to demonstrate that
her termination was the result of unlawful discrimination based
on her disability.  As discussed above, the evidence indicates
that she was terminated because of her failure to post the

26

## C. **Sex-Based Discrimination**

The plaintiff asserts one count of sex discrimination, set forth as Count Two of the complaint.   In that single count, however, the plaintiff expresses two types of sex discrimination claims.  First, the plaintiff asserts that she was denied raises, promotions, and/or benefits as a result of her gender, which the court views as a disparate treatment claim actionable under Title VII.   In the same count, plaintiff asserts that she was "regularly sexually harassed" by Buffalo's owner, McCarroll, and by a co-worker, Hawkins.   The court views this as a separate sexual harassment claim and will address both claims herein.


### 1. **Sexual Harassment**

The plaintiff asserts that she is entitled to relief under Title VII because she was subjected to a hostile work environment. In order to prove a *prima facie* case, the plaintiff must demonstrate that her workplace was permeated with discriminatory behavior that was sufficiently severe or pervasive to create a hostile or abusive working environment.   <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).  To be actionable, the environment must be both objectively

---

payments by customers within a reasonable time and that reason has not been shown to be a mere pretext.

and subjectively hostile, and whether the workplace may be deemed hostile "can be determined only by looking at all the circumstances." Id. at 23.  The relevant factors include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id.

The plaintiff sets forth many facts which indicate that Buffalo was a raunchy place in which to work, where employees engaged in sexual horseplay, used offensive language, and made inappropriate jokes and gestures.  The defendant asserts, however, that the sex-oriented behavior was neither severe nor pervasive enough to constitute sexual harassment under Eleventh Circuit Court of Appeals precedent.

### a.  Severe or Pervasive

The Eleventh Circuit Court of Appeals recently examined the "severe or pervasive" element of a Title VII claim in Gupta v. Florida Board of Regents, 2000 WL 633024 (11th Cir. May 17, 2000). The court recognized that an essential element of any hostile environment sexual harassment claim is that the conduct complained of be sufficiently severe or pervasive to alter the conditions of employment and to create a "hostile or abusive" work environment. See also Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir.

1999).   Requiring such proof "ensures that Title VII does not become a mere 'general civility code.'" Id. at *7, quoting Faragher, 524 U.S. at 788. Likewise, in Mendoza, the court of appeals explained:

> Although Title VII's prohibition of sex discrimination clearly includes sexual harassment, Title VII is not a federal "civility code." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S. Ct. 998, 1000-02, 140 L. Ed. 2d 201 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."); Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998) ("A recurring point in these opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" (internal citation omitted)); Meritor [Savings Bank,FSB v. Vinson], 477 U.S. at 67, 106 S.Ct. 2399 ("Not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII.").

Id. at 1245.   The court in Gupta went on to note that the requirement is critical to prevent the courts from turning ordinary socializing in the workplace into discriminatory conduct.   Id. Such ordinary socializing was deemed to include the "sporadic use of abusive language, gender-related jokes, and occasional teasing" as well as horseplay and intersexual flirtation.   Gupta, 2000 WL 633024 at *7.

As a result, the plaintiff must show that the conduct complained of goes beyond flirtation and sexual joking that is generally accepted within the workplace.  The defendant correctly asserts that the Supreme Court has recognized that it is not enough for Marlow to show that her workplace was offensive; rather, she must show that Buffalo's office was so permeated with discriminatory intimidation, ridicule, and insult that a reasonable person would perceive the environment as hostile or abusive.  See Meritor Savings Bank v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986).

In determining if this critical element of a sexual harassment claim has been met, the court must look to the frequency, severity, and pervasiveness of the conduct complained of.  Again, the court of appeals has said:

> The objective component of this analysis is somewhat fact intensive.  Nevertheless, the Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct;(3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.  Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir.1997) (citing Harris, 510 U.S. at 23, 114 S. Ct. 367).  The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment. Id.; see

30

> Harris, 510 U.S. at 23, 114 S. Ct. 367; Henson, 682 F.2d
> at 904; Faragher, 118 S. Ct. at 2283 (citing Harris, 510
> U.S. at 23, 114 S. Ct. 367, and explaining that "we
> directed courts to determine whether an environment is
> sufficiently hostile or abusive by 'looking at all the
> circumstances'").

Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999).

Marlow asserts that the presence of sexually explicit materials, the telling of sex-oriented jokes, and the use of sexual language was frequent, if not constant, among Buffalo employees. Jackson also has testified that the "sexual horseplay" occurred on almost a daily basis. More specifically, Marlow has testified that McCarroll rubbed her shoulders in an unwelcome manner more than twenty times and that Hawkins prodded her with his pen and gestured toward her breasts on many occasions. Defendant points out that McCarroll used the vulgar word plaintiff complains of only once and asked about her bra only once in the eight years Marlow worked at Buffalo. The court finds this argument unavailing, however.

Marlow complains that she was harrassed on some days by Hawkins and on some days by McCarroll. She further asserts that in addition to the conduct by Hawkins and McCarroll, the harassment took a more general form in the sexually explicit pictures scattered throughout the workplace and the more widespread presence of sexual touching or suggestive pranks. The atmosphere also was tainted with rumors, many now substantiated, of affairs between

employees and the company president or between co-workers. The court must consider the environment at Buffalo in terms of the complete workplace atmosphere on a daily basis.[15]  Having done so, the court finds that, viewed objectively, the conduct was offensive.  Moreover, the plaintiff has testified that she found the behavior subjectively offensive.[16]  Viewing the evidence in the light most favorable to the plaintiff, the conduct complained of was sufficiently severe and/or pervasive that it could constitute actionable sexual harassment.  Consequently, the plaintiff has met the first prong of proving a *prima facie* sexual harassment case.

### b.  Terms or Conditions of Employment

In order to establish her claim, the plaintiff also must show that the harassment altered the terms or conditions of her employment.  This issue presents a closer call.  On the one hand, the court cannot condone the conduct that apparently became commonplace at Buffalo; on the other hand, there is evidence that

---

[15]    Otherwise, an employee who is being harassed by numerous supervisors or co-workers would not have an actionable claim so long as the harassment of each individual was infrequent or not severe.

[16]    Marlow's letter to her employer written in the last weeks of her employment, and her conduct at the workplace in participating in some of the "jokes" belie her contention that she subjectively found the environment hostile.  However, such evidence relates to Marlow's credibility and is not sufficient to overcome Marlow's assertion that she was offended.

32

Marlow was relatively unaffected by the bawdy behavior.  She has
testified that in her last month at work she was putting in long
hours and performing extra tasks for Buffalo out of loyalty.  She
wrote a lenghty letter to McCarroll in which she never indicated
any displeasure about the sex-charged atmosphere.  She testified
that she got a hug from McCarroll and that she welcomed that
gesture.  Even so, this court is mindful that Title VII may be
violated even when the employee's psychological well-being has not
been seriously affected.  Harris, 510 U.S. at 21.  As a result, the
court must find that there is a genuine issue of material fact as
to whether the harassment altered the terms and conditions of
plaintiff's employment, and plaintiff has met her burden of
establishing a *prima facie* case of sexual harassment.

### 2.  Affirmative Defense

Based on the foregoing finding that the plaintiff has proven
a *prima facie* case of sexual harassment, the defendant's motion for
summary judgment is due to be denied unless the defendant has made
the requisite showing to support an affirmative defense.   The
defendant has asserted that the Title VII hostile environment claim
is due to be dismissed because the defendant enacted a sexual
harassment policy, and the plaintiff failed to reasonably avail
herself of any remedy.

33

The affirmative defense was established by the Supreme Court in Ellerth v. Burlington Industries, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).  To establish the affirmative defense, the employer must show that it took reasonable steps to prevent and correct sexual harassment and that the employee unreasonably failed to utilize corrective processes available to her.  Dees v. Johnson Controls World Service, 168 F.3d 417, 421 (11th Cir. 1999) (citing Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633 (1998), and Faragher, 524 U.S. 775, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998)).  B u f f a l o argues that there is no genuine issue of material fact regarding its exercise of reasonable care to prevent and correct sexual harassment in the workplace because it had policies and procedures in place to address the issue, and Marlow unreasonably failed to take advantage of the policy by declining to report the offensive conduct.

As a threshold for asserting the affirmative defense, the employer must show that the employee suffered no adverse employment action as a result of refusing or rejecting the sexual harassment. Marlow's complaint does not specifically allege that she was fired in retaliation for rejecting advances from McCarroll, and the court finds no support for any contention that her termination was an "adverse job action" precipitated by the harassment.  The defendant

has shown that the plaintiff's failure to properly perform her duties in October of 1996 was the reason that McCarroll fired her on November 7, 1996.  That reason has not been shown to be a pretext.  In fact, McCarroll had been absent from the workplace in the weeks leading up to the firing and, therefore, cannot have made any advances toward plaintiff in that time-span that she could have refused.  In short, there is no temporal connection between any of the alleged harassment and the firing; plaintiff admits that the horseplay, prodding, shoulder-rubbing, and joking had gone on in the Buffalo workplace for years.  Marlow offers no explanation for why she would suddenly be terminated in November of 1997 for rejecting advances made months or years before.

Plaintiff also asserts that she was once demoted as a result of sexual discrimination, but there is no evidence to support any "demotion."  The pay records indicate that Marlow's hourly wage never decreased, and frequently increased.  Meanwhile, her duties remained essentially the same.[17]  Consequently, because the plaintiff has not shown that any adverse employment action was taken in relation to her response to the alleged harassment, the affirmative defense is available to Buffalo upon the requisite showing.

---

[17]     Other assertions that she was denied raises or promotions are without any evidentiary basis.  Plaintiff has never even alleged that she sought a promotion or asked for a raise and was denied.

35

It is undisputed that Marlow received a copy of the employee handbook, which contained the policy prohibiting sexual harassment, and that she was aware of the employer's policies and procedures. The policy clearly instructed Marlow to report any offending conduct to her immediate supervisor or to the president of the company. There is no evidence in the record before this court to indicate that Marlow ever filed a complaint against Hawkins or McCarroll, or that she complained to any supervisory employee about the offensive work environment she encountered at Buffalo.[18] The court concludes that the defendant did take reasonable steps to prevent and remedy sexual harassment by instituting an anti-harassment policy and by distributing that policy to employees. Thus, the court finds that the first prong of the defense is met.

The second element focuses on whether the employee unreasonably failed to avail herself of remedial opportunities available to her. Marlow does not deny that she was aware of the anti-harassment policy, but she makes the bare assertion that she declined to complain because other women who complained were retaliated against. This assertion simply is not supported by any evidence. The only person Marlow names as a victim of retaliation

---

[18]   In a sur-reply brief, plaintiff's counsel recites that plaintiff complained about McCarroll's conduct to David Young, who was plaintiff's immediate supervisor during much of her tenure. However, there is no evidence to support this assertion. Counsel merely cites to the deposition of the plaintiff without making the relevant pages available to the court.

36

is Dana Armstrong, whom Marlow claims complained of harassment and was then retaliated against by being told not to wear certain items of clothing to work.  Armstrong, however, not only denies having complained, but also testified that Buffalo's dress code at the time prohibited the overalls and "cut-out" dress to which Marlow referred.  Consequently, Marlow has failed to support her "fear of retaliation" theory with substantial evidence.[19]

The court recognizes that in a situation like that at Buffalo, in which one of the alleged harassers was, at least at some times, the victim's only supervisor, the requirement that the victim lodge a complaint in accordance with the policy is especially onerous.  However, that unfortunate fact does not relieve the victim from the condition that she reasonably act in accordance with the policy.  In Harris, as in this case, the plaintiff's alleged harasser was the company president.  However, the plaintiff complained to him about his own conduct and elicited from him assurances that the harassment would stop.  Consequently, in Harris, the offending conduct was brought to the attention of the defendant, and the defendant was given an opportunity to remedy the harassment.  In the case at bar, there is no evidence that McCarroll knew that the

---

[19]   Similarly, plaintiff's counsel makes the bare assertion that a female employee was fired for having an affair with a co-worker, but the male employee remained employed.  Counsel provides a cite to Marlow's deposition, but the relevant testimony has never been provided to this court.

atmosphere at Buffalo was subjectively offensive to Marlow.  In fact, her own conduct often indicated otherwise, in that she engaged in sexual joking and displayed suggestive posters in her office.

Thus, the court agrees that plaintiff unreasonably failed to bring her complaints to the attention of Buffalo.  Because the defendant has carried its burden of establishing its entitlement to the <u>Ellerth</u> affirmative defense as a matter of law, the court finds that Buffalo's motion for summary judgment is due to be granted on this basis.

### 3. Disparate Treatment

Marlow asserts that she was treated differently than the men who worked at Buffalo.  Specifically, she alleges that she was denied raises and promotions, demoted, denied access to parking and to the company's gasoline pumps, and ultimately terminated on account of her sex.  Buffalo has responded by pointing out that there is no evidence that plaintiff was ever denied a raise or promotion, or was demoted.  As discussed *supra*, Marlow received raises throughout her career with Buffalo, and she has never asserted that she applied for or was qualified for any position that would constitute a promotion.  Marlow does not offer any male

38

comparator[20] who was paid more or who was on salary, she simply asserts that she should have been placed on salary.  That assertion is not supported by the evidence, which shows that sales personnel were paid by commission, warehouse workers by the hour, and that only a few employees were salaried.

Marlow's assertion that she was demoted also is not supported by the evidence.  Marlow admits she was never officially given the title of office manager, the position from which she was allegedly demoted.  Furthermore, her pay never decreased, and she left Buffalo with the same job she had when hired - credit manager.

Buffalo also asserts that there is no evidence that women were denied access to parking by the employer.  In fact, the testimony indicates that while the male employees sometimes took the parking places that were supposed to be reserved for customers, the male employees were forced to move their cars when the female employees complained.  She does not allege that female employees were told to move their cars when males were allowed to stay in the lot, as might support a sex discrimination claim.  To the contrary, Marlow seems to be asserting that the parking ban applied to both sexes, but that men violated the rule and women did not.  The court is not inclined   to   find   that   such   constitutes   evidence   of   sex

---

[20]    The males whose salaries or pay scales Marlow compares hers to had completely different duties and responsibilities from those of a credit manager.

discrimination.  Marlow admits she did not complain every time the parking spaces were taken by the male employees, and that she does not know whether her employer knew about the parking problems on the days the female employees did not complain.  Thus, even though the conduct recurred, there is no evidence that McCarroll or anyone in management was aware of the problem.

Finally, the plaintiff argues that men were allowed access to the company's supply of gasoline for their personal cars and that women were not.  Marlow bases this argument on the fact that none of the women had been issued gas keys that would operate the pumps, and all of the employees who had gas keys were men.  The defendant has stated that it had a nondiscriminatory reason for its distribution of gas keys.  Defendant has stated  that the gas keys were given only to employees who had to make deliveries on their way home, and consequently the gas keys were given only to warehouse workers, all of whom happen to be male.  Another employee of Buffalo testified that gas keys were given to any employee who asked for one.  In any event, nothing in the evidence indicates that there was any gender-based animus behind the gas key policy. Marlow does not argue that she ever requested a gas key or that she was ever required to make a delivery on her way home.

Even when the plaintiff succeeds in establishing a *prima facie* case of sex discrimination, the presumption of discrimination may

be rebutted if the employer offers a legitimate, nondiscriminatory reason for the employment action. Once the employer meets its burden of articulating a non-discriminatory reason, the burden shifts back to the plaintiff to show that the reason is either not worthy of belief or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the proferred reason. Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

To overcome the motion for summary judgment, Marlow must demonstrate by competent, admissible evidence that the defendant's nondiscriminatory reason is merely a pretext for discrimination against her. She must show not only that the articulated reason is false, but also that the defendants' true reason for the policy was discriminatory. See Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993).

The court's job is to consider whether the evidence "presents a sufficient disagreement to require submission to a jury." Combs, 106 F.3d at 1526. The court finds that Marlow has failed to meet her secondary burden of showing that the defendant's stated reason for the distribution of the gas keys was pretextual, and her claim

of sex discrimination is subject to summary judgment in favor of the defendant.[21]

### D.  Breach of Contract/ Breach of Covenant/ Wrongful Discharge

Marlow's claims asserting various forms of breach of contract are unworthy of lengthy discussion.  She has offered no evidence that she had any contract of employment.  The defendant has submitted the employee handbook, signed by Marlow, which clearly states that "[e]very Company employee is an employee-at-will." Alabama clearly is a state in which employment is almost universally deemed to be at-will, and employers may fire an employee "without cause or justification."  Hoffman-LaRoche, Inc. v. Campbell, 512 So. 2d 725, 728 (Ala. 1987).  Similarly, no claim for breach of a covenant of good faith and fair dealing can be sustained under Alabama law, and the plaintiff has failed to cite even a single case in which such a cause of action has been sustained in Alabama or in any other state.  To the contrary, it is well settled that, absent a contract of employment, a claim for breach of good faith must fail.  Hanson v. New Technology, 594 So. 2d 96, 99 (Ala. 1992).  For the same reasons, Marlow's wrongful

---

[21]    The same reasoning applies to plaintiff's vague claim that her termination was discrimination based on sex.  As discussed in full in the court's consideration of the sexual harassment claim, the defendant has offered a nondiscriminatory reason for plaintiff's termination and the plaintiff has failed to offer any evidence that the reason is incredible.

discharge is not actionable under Alabama law because, absent a discriminatory reason (which plaintiff has failed to demonstrate), the employer is free to fire an at-will employee for a good reason, a bad reason, or no reason at all.  Hall v. Integon Life Ins. Co., 454 So. 2d 1338, 1344 (Ala. 1984).  Accordingly, the defendant's motion for summary judgment on plaintiff's breach of contract claim and breach of covenant claim is due to be granted.

### E.   Fraud

Marlow attempts to assert a fraud claim by alleging that Buffalo misrepresented "the fact that plaintiff would be judged upon the basis of merit and ability" and would be interviewed and evaluated for other jobs within Buffalo.  In her briefs, but not in the complaint, Marlow asserts that the alleged fraudulent statement was that she was told upon hiring that she would eventually be placed on salary, and that she was not.  At best, both of these claims state a cause of action for promissory fraud, and under Alabama law such a claim requires a showing that the defendant knew the statement was false when it was made and never intended to carry out its promise.  See, e.g., Clanton v. Bains Oil Co., 417 So. 2d 149 (Ala. 1982).  Marlow offers no such evidence of intent to deceive, and the court finds no support for such an argument in the evidence before it.  Consequently, the summary judgment motion

43

is due to be granted, and plaintiff's fraud claim is due to be dismissed.

### F.  Outrage

The plaintiff states a claim for intentional infliction of emotional distress, more commonly known in Alabama as the tort of outrage.  The tort was first recognized by the Alabama courts in American Road Service Company v. Inmon, 394 So. 2d 361 (Ala. 1980). Since then, the Alabama Supreme Court has repeatedly made clear that a remedy is reserved for only the most egregious conduct, conduct that is both "extreme" and "outrageous" and that goes "beyond all possible bounds of decency" so as to be "atrocious and utterly intolerable in a civilized society." See, e.g., Jackson v. Alabama Power Co., 630 So. 2d 439, 440 (Ala. 1993); Thomas v. BSE Indus. Contractors, Inc., 624 So. 2d 1042, 1044 (Ala. 1993). Conduct that is not sufficiently severe or pervasive as to constitute sexual harassment certainly cannot be deemed to rise to the level of egregiousness required to sustain a claim of outrage under Alabama's strict standard.  See, e.g., Shepherd v. Summit Mgt. Co., 726 So. 2d 686, 694 (Ala. Civ. App. 1998).  Consequently, the motion for summary judgment is due to be granted.

Plaintiff's outrage claim fails to survive the defendants' motion for summary judgment for a second reason.  Not only must the

44

conduct that prompts an outrage claim be deemed egregious, the emotional distress that results also must be so extreme that "no reasonable person could be expected to endure it." <u>Potts v. Hayes</u>, 2000 WL 548198 at *3 (Ala. May 5, 2000).  Marlow makes no such showing of emotional distress.  For this additional reason, the defendant's motion for summary judgment on Marlow's outrage claim is due to be granted.

### IV.   CONCLUSION

Based on the foregoing undisputed facts and legal conclusions, the court determines that the motion for summary judgment filed by Buffalo is due to be granted and this action dismissed with prejudice.

A separate order will be entered in accordance with the findings set forth herein.

DATED this 21st day of September, 2000.

_____
T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE